## SEISEL & COMPANY et al. v. WELLS et al.

<table>
<tr><td>99</td><td>159</td></tr>
<tr><td colspan="2">Case 2</td></tr>
<tr><td>119</td><td>37</td></tr>
</table>

*Lumpkin, J.*—1. Persons against whom there is no prayer for process are not parties defendant to an action, and the clerk has no authority to annex to a petition a process requiring their appearance.
2. A mere acknowledgment of service upon a petition and a waiver of service of the same, is not a waiver of process; nor a waiver of a prayer for process. *Ross & Son* v. *Jones*, 52 Ga. 22.
3. The present petition was, as to two of the persons named therein as defendants, rightly dismissed "for want of process and service."
4. As to the main defendant and his wife, against whom process was prayed, there was equity in the petition, and it was error to dismiss the same so far as they were concerned.

*Judgment affirmed in part, and in part reversed.*

June 12, 1896.  By two Justices.  Argued at the last term.

Equitable petition.     Before Judge Fish.     Dooly superior court.   March term, 1895.

Seisel & Company and four others, for themselves and such other creditors as might join them, brought their petition against A. Wells, Mollie E. Wells, Frances M. Wells, F. W. Dunton, J. W. Haygood, and M. B. Gilmore, sher-

iff.  At the final trial, plaintiffs struck the name of Haygood as a party defendant.  Defendants demurred to the petition as amended, for want of equity, and for misjoinder of parties and causes of action.  They also moved to dismiss the petition as to F. M. Wells and F. W. Dunton, for want of process and service.  Both the demurrer and motion were sustained, and plaintiffs excepted.

The petition alleges the following:  A. Wells, who has lately been doing a general merchandise business at Montezuma, is indebted to the plaintiffs in stated amounts.  Mollie E. Wells is his wife; Frances M. Wells (residing in Terrell county) is his sister-in-law; and F. W. Dunton is a resident of New York State.  Wells began the business in which the debts herein complained of were contracted, in September, 1893, when there were no claims outstanding against him of which the commercial world could have notice, except a mortgage to John F. Lewis & Sons, of Montezuma, for $666.66, which was of record, and which appeared to be dated November 9, 1892, due September 26, 1893, on nine head of live stock valued at $1,150; which mortgage plaintiffs believe to be *bona fide*.  At that time he returned for taxes $7,330, of which $6,000 was for real estate; in the year before he had returned $7,000 in real estate and. other property at $1,702.  These returns procured him an exaggerated and fictitious commercial rating, which enabled him subsequently, as he intended and knew they would do, to buy from plaintiffs and other merchants large amounts of goods on credit by reason of said large tax returns; and by reason thereof, coupled with the fact that he was (as he still is) in possession of a large farm in Dooly county, he came to be rated at a fictitious value in the commercial world.  By reason thereof the commercial agency of R. G. Dun & Co., to which plaintiffs are subscribers, rated him from five to ten thousand dollars; and in this way plaintiffs were induced to give him credit.  When

he made these large tax returns, he had no title in this large property, title thereto being in F. W. Dunton, one of the new mortgagees who is already secure, never having parted with title to said farm, the large balance of purchase money due thereon having been used by Wells as a basis of the mortgage of $2,015.05 on the stock of goods as a double covering against his merchandise creditors, and a triple covering being the Dunton mortgage for the same debt covering all the personalty, live stock, produce, etc., on the Dunton farm in Dooly, the plantation on which he was farming. The title to said land was then and still is in Dunton. Plaintiffs desire to ascertain the exact interest of Wells, if any, in said property, and to subject the same to the payment of his debts. Said tract contains 1,600 acres worth five or six dollars an acre at private sale, and about half or less than half that amount at public sale. With the commercial rating thus acquired, Wells began business early in September, 1893, apparently free from all incumbrances except the Lewis note. He began to buy from plaintiffs and others on credit, selling for cash. He kept up this practice, paying very few of his current creditors, and none of plaintiffs, until January 1, 1894, when he executed mortgages covering the stock in the store at Montezuma, to Mollie E. Wells, Frances M. Wells, J. W. Haygood, the attorney for mortgagees, and F. W. Dunton. His wife's mortgage is for $800 principal, $236.32 interest, besides cost and additional interest; the alleged indebtedness being a note to her made on June 2, 1890, due one day after date. The sister-in-law's mortgage is for $800 principal, and purports to secure a note due one day after date, December 26, 1893. Haygood's mortgage purports to secure an indebtedness by note of the same date, due one day after. The mortgage to Dunton appears to secure notes to the amount of $2,015.05, made January 1, 1891, due January 1, 1894. These mortgages were duly recorded. Simultaneously with their execution, he proceeded to secure

all the mortgagees except Haygood, by mortgaging to them to secure the same debts, about the same day, all his live stock on his plantation in Dooly county (on which Lewis & Sons already had a first mortgage) except a horse. These later mortgages also covered nine or ten other head of live stock, large quantities of fodder, corn, etc., cattle and pigs, a steam boiler and attachments, and practically everything he had on his farm. The mortgagees did not foreclose on the live stock and other things necessary to run the farm, but on the stock of goods bought from plaintiffs and other creditors, and still unpaid for, which were obtained when Wells knew he was insolvent and could not pay for them. At the time of the foreclosure (January 5, 1894) the safe in the store had been emptied of all cash except a ten dollar bill. The attorney for the mortgagees is shown by his own letters to be attorney for Wells in matters arising out of the same transaction, showing collusion to keep the property in the Wells family. Wells continued to buy until the last. He ordered goods from one of plaintiffs on December 20, and said he would pay in a few days, well knowing at the time that he was insolvent and could not pay. He bought goods soon after he started his Montezuma business from another of plaintiffs, and has since paid him $17 only to get indebted to him $135.36. From the same plaintiff he bought goods on December 27, the day after the notes to his kinsfolk and others were made; and bought from the traveling salesman of the same plaintiff on Saturday, December 30, and on the following Monday executed the mortgages. He knew he was insolvent when he bought these goods, and did not intend to pay for them. Some of plaintiffs' goods are still in stock, with their marks and brands on them; as to such they wish to rescind the contract of sale for fraud, and be allowed to identify and take back their goods as credits upon their claims, or that they be separated and sold by a receiver in separate parcels, and credited upon the accounts; and as

to such as cannot be identified or traced, plaintiffs ask for judgment against Wells for such amounts as may appear to be due. All the mortgages on the goods were executed at the same time, and also those on the personalty on the farm; and none of them are in the line of business in which merchandise is bought and sold. Upon their face each is disclosed to be of a series of equal dignity; they appear to have been filed for record by preconcerted action at or about the same time; and were given under one comprehensive plan to defeat the debts of plaintiffs and other merchandise creditors, and to hinder and delay all such just claims. The intention of them all was to use the alleged indebtedness to delay creditors against his just debts contracted in the merchandise business. They are in fact and law an assignment; and having no schedule of creditors and no inventory as required by law, they are null and void. In addition to prayers for injunction and receiver, plaintiffs ask for judgment for their claims against Wells, and that the mortgages be cancelled. By amendment they waive discovery, and charge M. E. Wells and F. M. Wells to be insolvent. They also allege demand for payment of Wells, and refusal to pay; and that they are unsecured creditors. By further amendment they pray: (1) that if it appear that the mortgages on the stock of goods have been foreclosed and the goods sold, they have judgment against the mortgagees and Wells for the amounts of their respective claims; (2) that if it appear that any of said goods are in the possession of the mortgagees or of Wells, the title be rescinded for fraud and they be allowed to reclaim their goods.

The petition prayed for process requiring A. Wells and M. E. Wells to be and appear, etc., but did not pray for process against any other of the defendants named therein. The two just mentioned were served; and there was an acknowledgement of service signed by J. W. Haygood as attorney at law for the other defendants (naming them), in

these words: "Due and legal service acknowledged on the within petition and restraining order. Copy and service of the same waived." The clerk had attached a process directed to each and all of the defendants (naming them) to second originals for Macon and Terrell counties. The acknowledgment of service by Haygood was made on the second original for Macon county; while upon the second original for Terrell county was an entry of service "of the within process personally" on F. M. Wells, signed by the sheriff of Terrell county.

*J. H. Blount, Jr.,* and *O. M. Smith,* for plaintiffs.