Mrs. Carl KING, Administratrix of the Will of Mrs. Marjorie Frampton Dobbs, and Samuel Candler Dobbs, Jr., Plaintiffs,

v.

KINGS COUNTY LAFAYETTE TRUST COMPANY, Trustee (formerly known as Lafayette National Bank of Brooklyn in New York), Defendant,

M. E. Kilpatrick and C. H. Candler, Jr., as Trustees under Trust Agreement dated December 9, 1940, Intervenor-Defendants.

No. 68–C–645.

United States District Court,
E. D. New York.

Sept. 15, 1970.

Cichanowicz & Callan, New York City, Hoke Smith, James R. Harper, Atlanta, Ga., for plaintiffs; Michael J. Ryan, New York City, of counsel.

Wrenn & Schmid, Brooklyn, N. Y., for defendant; Pallister Feely, Brooklyn, N. Y., of counsel.

Hall, Casey, Dickler & Howley, New York City, M. E. Kilpatrick, Emmet J. Bondurant, Atlanta, Ga., for intervenor-defendants; John Howley, New York City, of counsel.

ZAVATT, District Judge.

This case involves competing claims of ownership of approximately 11,000 shares of Coca-Cola stock held by the Kings County Lafayette Trust Company (Trust Co.) pursuant to a 1936 trust agreement hereinafter referred to. The plaintiffs claim that the trust agreement was terminated by the settlor, the plaintiff Samuel Candler Dobbs, Jr. (hereinafter Dobbs, Jr.), and his deceased wife, Marjorie Frampton Dobbs, (hereinafter Mrs. Dobbs, Jr.) pursuant to a written agreement between them; that that agreement was approved by an order of the Superior Court of Fulton County, Georgia, dated December 1, 1967, (which had previously issued a decree of absolute divorce dated November 13, 1936) and that, pursuant to that agreement as so approved before the death of Mrs.

Dobbs, Jr., the said shares of stock were to have been distributed as follows: 8,000 shares to Mrs. Dobbs, Jr.; 1,000 shares to her attorney and 2,000 shares to Dobbs, Jr.

The plaintiffs instituted this action to compel the Trust Co. to distribute the said stock pursuant to the terms of the said decree of the Georgia court. They have moved for summary judgment on the sole ground that the said decree is entitled to full faith and credit under Article IV, § 1 of the Constitution of the United States. The plaintiffs' motion is denied.

The intervenors contend that they are the owners of the said stock by virtue of the terms of a 1940 trust (Emory Trust); that, upon the death of Mrs. Dobbs, Jr., the 1936 trust terminated and the stock should have been delivered to them by the Trust Co., as trustees of the Emory Trust, hereinafter referred to. They have made a cross-motion for summary judgment. That motion is granted.

### The Facts

The junior Dobbses married in the State of Georgia on April 15, 1925. Mr. Dobbs, Sr. was a citizen and resident of the State of Georgia and, obviously, a wealthy man. His assets included 90% of the stock of Lichens Company (Lichens). Dobbs, Jr. owned the remaining 10% by gift from his father. The assets of Lichens included 2,500 shares of Coca-Cola stock which it had purchased on April 9, 1930 through Dobbs and Company, a stock brokerage firm in New York City, of which Dobbs, Jr. was a partner. This stock and all stock dividends thereon were carried on the books of Lichens from the date of purchase (1930) to the date of the liquidation of Lichens (February 26, 1951) as a Lichens capital asset. From the time of this purchase in 1930 until 1957, long after. Mr. and Mrs. Dobbs, Jr. were divorced, the stock was held by Dobbs & Company in a street name designated by that firm.

In 1936 Mr. and Mrs. Dobbs, Jr. came to a parting of the ways while she was a patient at New York Hospital in White Plains, New York, and he was a partner of Dobbs & Company. Negotiations leading toward a separation agreement (to be incorporated in a divorce decree) were conducted by and between Woodruff & Ward (of Atlanta, Georgia) and S. James Kennedy of New York, as attorneys for Mrs. Dobbs, Jr., and the law firm of Harold Hirsch & Marion Smith of Atlanta, Georgia, as attorney for Dobbs, Jr. These negotiations resulted in a separation agreement, dated October 19, 1936, which was executed by the parties thereto in New York State. Basically, it provided for monthly support payments to Mrs. Dobbs, Jr. of $600, plus additional obligations on the part of Dobbs, Jr., under special contingencies not here relevant.

Dobbs, Jr., apparently, did not possess the requisite assets to secure performance of his obligations under the proposed separation agreement. He requested Harold Hirsch and M. E. Kilpatrick, members of the Atlanta, Georgia, law firm which had handled personal and business affairs of the Dobbs family, to intervene in his behalf with Dobbs, Sr., with whom he did not enjoy a close relationship. They asked Dobbs, Sr. to consent to the pledging of the 2,500 shares of Coca-Cola stock, owned by Lichens and held by Dobbs & Company, in order to secure the obligations Dobbs, Jr. was to assume under the proposed separation agreement. Dobbs, Sr. consented. Whereupon, a trust agreement, dated October 19, 1936, was executed in New York State by and between the junior Dobbs and the Trust Co., pursuant to which the Trust Co. was to hold the stock to secure the obligations of Dobbs, Jr. under the separation agreement. In that trust agreement, Dobbs, Jr. represented to his wife and the Trust Co. that he was the owner of the stock:

TENTH

To secure the payments hereinbefore provided for, the First Party has granted, conveyed, assigned, set over and delivered, and by these presents

does grant, convey, assign, set over and deliver unto the said Trustee, its successors and assigns, absolutely and without power of revocation, all his right, title and interest in and to certificates of stock representing in all Twenty Five Hundred (2500) Shares of the Capital Stock of Coco [sic] Cola Bottling Company, of New York, a New York Corporation, together with the appurtenances and all the rights of the First Party thereto; and the First Party guarantees said stock to be free and clear of any and all claims or liens of whatsoever character and that he has good title thereto as against all persons whomsoever * * *.

After the separation and trust agreements had been executed, Mrs. Dobbs, Jr. instituted an action for a decree of divorce in the Superior Court, Fulton County, Georgia. Dobbs, Jr. did not contest that action. The separation agreement (but not the trust agreement) was submitted to the court and incorporated into the decree of divorce signed by Judge Virlyn Moore, dated November 13, 1936.

On December 9, 1940, Dobbs, Sr. created an *inter vivos* trust (the Emory Trust) for the benefit of Emory University of Atlanta, Georgia, of which Dobbs, Jr., Lewis B. Hall, and M. E. Kilpatrick were named trustees. Dobbs, Sr. turned over to these trustees all his stock in Lichens, subject to his life interest therein.

On December 6, 1941, Dobbs, Jr. sold his 10% interest in Lichens to that Company for $250,000. By virtue of this sale, Lichens owned a life interest in the 2,500 shares of Coca-Cola stock (subject to the Brooklyn Trust for Mrs. Dobbs, Jr.), with remainder to the Emory Trust. Lichens, therefore, continued to receive the dividends on the stock after this date, as it had since 1936, while Dobbs, Sr. was alive. From 1936 to 1951 the cash dividends aggregated approximately $62,500.

Dobbs, Sr. died in Georgia on October 31, 1950. Dobbs, Jr. filed objections to the probate of his father's last will and testament. The dispute was compromised between Dobbs, Jr., the executors of his father's estate (M. E. Kilpatrick and the First National Bank of Atlanta), and Emory University, by the payment of approximately $500,000 to Dobbs, Jr.

Lichens was liquidated on February 26, 1951. As of this date, title to all assets of Lichens, including the shares of Coca-Cola stock, vested in the Emory Trustees pursuant to the Emory Trust. The Coca-Cola stock was still held by Dobbs & Company. The dividends thereon which, until 1951, had been paid by Dobbs & Company to Lichens were thereafter paid by Dobbs & Company to the Emory Trustees. The cash dividends so paid from 1951 to 1957 aggregated approximately $42,000.

In 1952, Dobbs, Jr. defaulted under the separation agreement and the Trust Co. sold a sufficient number of shares of Coca-Cola stock, upon instructions to Dobbs & Company, to provide funds out of which to pay to Mrs. Dobbs, Jr. the amounts of all such defaults.

On March 2, 1957, Dobbs & Company was dissolved. R. Glynn Mays, a partner in Dobbs & Company, was appointed Liquidator. As part of his duties, he received the cash dividends on securities still registered in the name of Dobbs & Company, including dividends on the Coca-Cola stock at issue, and paid the latter to the Emory Trustees. Finally, on December 27, 1963, Mays received notice that the certificates for the Coca-Cola stock held in the Dobbs & Company street name had been canceled, and were now held by the Trust Co., in the street name of its designee. Mays has continued to receive dividends on 1,114 shares of Coca-Cola stock (these shares were stock dividends on the original shares) after 1963 and has paid all of the same to the Emory Trustees.

Since 1963, the Trust Co. has received the dividends on all but the 1,114 shares

still being held by the Liquidator, and has maintained said dividends in a segregated account—apparently awaiting the resolution of the conflicting claims to the Coca-Cola stock.

When Lichens was dissolved in 1951, Ralph J. Sauls, an accountant, was hired by the Emory Trustees to audit the Emory Trust (and the Lichens records) in order to determine the trust assets. He noted that the Coca-Cola stock had been carried continuously on the books of Lichens as a company asset, subject only to their hypothecation in trust to guarantee performance by Dobbs, Jr. of his obligations under the separation agreement. Before so certifying, he asked M. E. Kilpatrick to obtain written confirmation from Dobbs, Jr. There followed correspondence between Dobbs, Jr. and M. E. Kilpatrick, an attorney and one of the trustees of the Emory Trust. Finally, in response to a letter from Kilpatrick to Dobbs, Jr. (dated June 27, 1951), Dobbs, Jr. acknowledged that the Coca-Cola stock was an asset of Lichens, subject only to its said hypothecation.[1]

After this letter was signed and on August 22, 1951, Kilpatrick wrote to the Trust Co. to ascertain whether its records disclosed the true ownership of the Coca-Cola stock. The Trust Co. suggested to Kilpatrick that Dobbs, Jr. execute an instrument to evidence the ownership of the stock in the Emory Trustees. There followed considerable correspondence between Kilpatrick, Pallister Feely (attorney for the Trust Co.), Dobbs, Jr., and his attorney Harter F. Wright, of the law firm of Duer & Taylor in New York City. Finally, after several proposed drafts of the letter, Dobbs, Jr. signed a letter on April 24, 1952, attested to by his attorney, Harter Wright. He confirmed the fact that the stock had been loaned to him and that, subject to

1. SMITH, KILPATRICK, CODY,
ROGERS & McCLATCHEY
Hurt Building
Atlanta 3, Georgia
June 27, 1951.
Mr. S. C. Dobbs, Jr.,
Dobbs & Co.,
50 Broadway,
New York 4, New York.
Dear Candler:
The Trustees of the Lichens assets are having an audit made of the company for the period January 1, 1951, through February 26, 1951, which was the date the company was liquidated.
Mr. R. J. Sauls, the auditor, among other things, is verifying the location of all securities. and he wishes to verify the location of the 2,500 shares of Coca-Cola Bottling Company of New York common stock which the company's records show are held by LaFayette National Bank of Brooklyn in New York under the trust agreement dated October 19, 1936, between you, Marjorie and said bank as Trustee, under which contract the said shares are held as security for the performance of your obligation to Marjorie.
I tried to call you this morning, and you were out of the office, and I talked with Al Groiner, and he confirmed the fact that said 2,500 shares are still in street name of Dobbs & Co. and held by the said bank as Trustee. All of the Lichens statements from Dobbs & Co. confirm this, and all dividends on the 2,500 shares have been paid to Dobbs & Co. and were credited to the Lichens Company account.
I would greatly appreciate if you would confirm this on the enclosed copy of this letter.
Best regards.
(s) S. C. Dobbs, Jr.
Yours,
(s) M. E. Kilpatrick
M. E. Kilpatrick
MEK:LF
Encl.
SMITH, KILPATRICK, CODY, ROGERS & McCLATCHEY
Page 2 Mr. S. C. Dobbs, Jr. June 27, 1951.
Mr. R. J. Sauls,
Auditor.
The status of said 2.500 shares of Coca-Cola Bottling Company of New York common stock is as stated in Mr. Kilpatrick's letter above, and the ownership of the stock is in the Lichens Company, subject to the terms of said agreement.
This ——— day of ————, 1951.
(s) S. C. Dobbs, Jr.

the Brooklyn Trust for his ex-wife, was owned by the Emory trustees.[2]

Between 1952 and 1961, the defaults of Dobbs, Jr., under the separation agree-

2. Lafayette National Bank of Brooklyn,
100 Livingston Street,
New York, New York.
Re: Trust Instrument dated October 19, 1936, Between Samuel Candler Dobbs, Jr., Marjorie Frampton Dobbs and Lafayette National Bank of Brooklyn in New York.

Gentlemen:

Reference is made to the above instrument of trust and to letter dated June 27, 1951, addressed to me by M. E. Kilpatrick of Atlanta, Georgia, a copy of said letter and my acknowledgment thereof being hereto attached.

My purpose in addressing you at the present time at the request of M. E. Kilpatrick and C. H. Candler, Jr., Trustees under Deed of Trust dated December 9, 1940, created by S. C. Dobbs is as follows:

1. First, I wish to confirm the fact as stated in my acknowledgment of said letter of June 27, 1951, that the 2500 shares of Coca-Cola Bottling Company of New York common stock transferred by me to you as Trustee under the said indenture of October 19, 1936, were lent to me for this purpose by The Lichens Company, a corporation. Under the terms of the loan I had the right and power to deposit the said shares under the said indenture of October 19, 1936;

2. However, the ownership of said shares of stock, subject only to the rights of the Trustee and Mrs. Dobbs under the said indenture of October 19, 1936, remained in The Lichens Company. Upon the liquidation of The Lichens Company on February 26, 1951, the ownership of such shares, subject to the rights of the Trustee and Mrs. Dobbs under the indenture of October 19, 1936, vested in the Trustees under the said Deed of Trust dated December 9, 1940, created by S. C. Dobbs.

Therefore, at such time as the said Page 2 Lafayette National Bank of Brooklyn 2500 shares of stock are no longer subject to the terms of said trust indenture of October 19, 1936, you are requested and directed to deliver the said shares of stock, or such stock or securities as may be held under the said indenture to the Trustees under the Deed of Trust dated December 9, 1940, created by S. C. Dobbs. The address of said Trustees is 1045 Hurt Building, Atlanta, Georgia.

Should there be any change in the identity of the Trustees under the said trust agreement of December 9, 1940, you are authorized at such time as the said 2500 shares of stock are no longer subject to the terms of the trust instrument of October 19, 1936, to deliver said shares to the person or persons then acting Trustee(s) under the trust of December 9, 1940, and any such delivery made by you in good faith shall be binding upon me;

3. You are likewise requested to furnish to the said Trustees under the said Deed of Trust dated December 9, 1940, at the address above indicated, a copy or copies of any and all demands or notices which you may in the future make on me under the terms of said indenture of trust dated October 19, 1936;

4. The said 2500 shares of stock are presently in the street name of Dobbs & Co. It is desirable that the said shares of stock be placed in a street name other than Dobbs & Co., so that the Trustees under the said trust of December 9, 1940, will have no difficulty in claiming dividends on such stock. The street name in which said shares of stock shall be placed may be such street name or such nominee as shall be agreeable to you and to the Trustees under the trust of December 9, 1940. It is of no concern to me what nominee is selected for this purpose inasmuch as I have no interest in the said shares of stock.

Page 3 Lafayette National Bank of Brooklyn

Would you, therefore, please accept this letter for the purposes as stated above and place this letter with your files on this trust.

I have, therefore, executed this letter with the same formality as that followed in the execution of said trust indenture of October 19, 1936.

Yours very truly,
(s) S. Candler Dobbs (L.S.)
Samuel Candler Dobbs, Jr.

Before me, the undersigned attesting officer, personally appeared S. C. DOBBS, JR., who on oath says that he executed the foregoing instrument voluntarily, and that the facts stated therein are true.

(s) Harter F. Wright.
Sworn to and subscribed before me, this 24th day of April, 1952.

(s) Harter F. Wright
Notary Public

ment, had resulted in the sale of over 2,100 shares of Coca-Cola stock by the Trust Co. in order to cure said defaults.

In 1961, Mrs. Dobbs, Jr., through her attorney, Cullen Ward, sought an increase of the monthly alimony. Conferences and correspondence ensued between her attorney and M. E. Kilpatrick, one of the trustees of the Emory Trust. By virtue of the negotiations, her attorneys knew that the Emory trustees claimed ownership of the Coca-Cola stock and that Dobbs, Jr. had admitted in writing that the stock was not an asset of Dobbs, Jr. In this setting, it is understandable why Ward, acting for Mrs. Dobbs, Jr., communicated with the Emory trustees in his attempt to have the alimony increased and the trust terminated. Dobbs, Jr., quite magnanimously, was willing that the alimony be increased from $600 to $800 per month, provided the Emory Trust would guarantee his obligations to pay it. In light of his previous defaults under the separation agreement, it is not surprising that Emory University, the beneficiary of the Emory Trust, rejected the suggestion.

Because the Emory trustees were unwilling to cooperate in the manner discussed, Mr. and Mrs. Dobbs, Jr. took matters into their own hands, thus precipitating the instant law suit.

Cullen Ward, the attorney for Mrs. Dobbs, Jr., drafted a petition for revision of judgment for permanent alimony, which would terminate the Brooklyn Trust; absolve Dobbs, Jr. of all further obligations under the 1936 separation agreement; distribute the corpus according to a lump sum settlement agreement between the junior Dobbses (and submitted with the said petition), as follows:

8,000 shares to Mrs. Dobbs, Jr.

2,000 shares to Mr. Dobbs, Jr.

1,000 shares to Cullen Ward

At the time this instrument was executed, the market value of the Coca-Cola shares was approximately $277,000; Mr. Dobbs, Jr. was living in Florida; his wife was suffering from some physical, mental or emotional ailment. The lump sum settlement agreement, purporting to terminate the 1936 trust, was executed on October 13, 1967 by Mr. and Mrs. Dobbs, Jr. and witnessed by Cullen Ward. It reiterated the paragraph of the prior trust agreement in which Dobbs, Jr. claimed to own the Coca-Cola stock.

That same day, both parties consented to a modification of the decree of divorce by an instrument in writing signed by Mr. and Mrs. Dobbs, Jr. and attorney Ward. On October 16, 1967, the petition for revision of the Georgia divorce decree, which incorporated the lump sum settlement agreement entered into three days previously as well as the consent to the revision signed the same day, was ordered filed by Judge Moore. The affidavit attached to the petition swearing to the truth of the allegations therein was executed only by Mrs. Dobbs, Jr. Need one speculate as to why Dobbs, Jr. did not swear to the truth of the Brooklyn Trust agreement wherein he represented in 1936 that he was the owner of the Coca-Cola stock?

On December 1, 1967, the order modifying the 1936 decree of divorce and directing the distribution of the Coca-Cola stock was signed by Judge Moore.

Although the trustees of the Emory Trust (M. E. Kilpatrick and C. H. Candler) were citizens of Georgia and Mr. Kilpatrick, with whom negotiations had been had to induce the Emory trustees to guarantee performance of the proposed increased alimony payments by Dobbs, Jr. was an attorney with offices in Atlanta, where the petitioning attorney maintained his offices, no notice was served on either of the Emory trustees of the proceedings being brought before Judge Moore. Nor was any such notice served upon the Trust Co.

It is also noteworthy that Dobbs, Jr. has not furnished an affidavit in support of the plaintiffs' motion for summary judgment.

*Plaintiffs' contention that full faith and credit should be given to the 1967 judgment of the Georgia court.*

The plaintiffs, contending that full faith and credit must be given the 1967 Georgia judgment, cite Article IV, § 1, of the Constitution; 28 U.S.C. § 1738; and Georgia Code § 110–708. These sections provide:

§ 1738. *State and Territorial statutes and judicial proceedings; full faith and credit*

\* \* \* \* \* \*

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

§ 110–708

*Collateral attack on judgments*—The judgment of a court of competent jurisdiction may not be collaterally attacked in any other court for irregularity, but shall be taken and held as a valid judgment until it is reversed or set aside.

The plaintiffs claim that the full faith and credit clause of the Constitution requires each state to give the same faith and credit to a judgment of a sister state as that sister state would give to that judgment; that under the law of Georgia a judgment is valid until attacked in a court of that state; that, therefore, this court is foreclosed from considering the validity of the Georgia judgment in a collateral suit such as this.

█ If this argument were valid, a state could, in effect, determine the manner in which a sister state must accept its judgments, even if they were illegally rendered. It is not necessary for this court to analyze this argument in depth because the sine qua non of the argument, § 110–708 of the Georgia Code, was repealed as of September 1, 1967. See

1966 Georgia Civil Practice Act, § 81 A–201(jj). Since the attempt to revise the prior award of alimony was not commenced until October 16, 1967, when the "Petition for Revision of Judgment of Permanent Alimony" was filed in the Fulton Superior Court, there is no question that § 110–708 was not in effect at that time and is totally inapposite.

Thus foreclosed from reliance on a repealed section of the Georgia Code (of questionable constitutionality), plaintiffs' reliance upon the full faith and credit clause must stand or fall on the question of whether the 1967 Georgia judgment (1) binds those not made parties to the Georgia litigation and, also, (2) is valid under Georgia law.

*Who was bound by the Georgia judgment?*

Assuming arguendo that the Georgia judgment is valid as to Mr. and Mrs. Dobbs, Jr., the question remains whether the Emory trustees and the Trust Co. are bound by that judgment.

It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process. \* \* \* A judgment rendered in such circumstances is not entitled to the full faith and credit which the Constitution and statute of the United States \* \* \* prescribe \* \* \* and judicial action enforcing it against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments requires. \* \* \* Hansberry v. Lee, 311 U.S. 32, 40–41, 61 S.Ct. 115, 117–118, 85 L.Ed. 22 (1940)

*See also* Restatement, Judgments § 6. Under Georgia law, a person not served, nor made a party is not bound by a judgment. Todd v. Conner, 220 Ga. 173, 137 S.E.2d 614, 618 (1964); Sowell v. Sowell, 212 Ga. 351, 92 S.E.2d 524, 525 (1956); Winn v. Armour & Company, 184 Ga. 769, 772, 193 S.E. 447, 449 (1937) ["A judg-

ment rendered against the defendant where there has been no service of process or waiver thereof is a mere nullity."] ; Mills v. Cairo Banking Co., 176 Ga. 714, 168 S.E. 765 (1933) ; Seisel & Company v. Wells, 99 Ga. 159, 25 S.E. 266 (1895) ["Persons against whom there is no prayer for process are not parties defendant to an action."]. *See also* 10 Encyclopedia of Georgia Law, Equity § 136, at 644–645 (1966).

■ It is undisputed that neither the Emory trustees, Emory College, nor the Trust Co. was designated as a party or served with process in the 1967 Georgia proceeding. Plaintiffs rely on several specious arguments to circumvent the clear import of *Hansberry, supra*, as well as the law of Georgia, none of which have merit. First, they argue that *Hansberry* was a class action and that its holding is not controlling. This argument, rather than supporting plaintiffs' contention cuts the other way. While it is true that *Hansberry* deals with class actions, a close reading of the case indicates that the above-cited language precedes any discussion of class actions and, further, that class actions may, in some instances, be an exception to the above-cited rule. The instant case is *not* a class action and, therefore, the general rule applies, *i. e.*, that those not served are not bound. Second, plaintiffs argue that the pendency of the Georgia suit was noted in the Fulton County Daily Report, the official organ of Fulton County; that one of the Emory trustees, M. E. Kilpatrick, as a member of the Georgia court, is charged with the notices in that publication; that, therefore, he is charged with notice of the pendency of the 1967 proceedings. Plaintiffs appear to argue that actual and/or constructive notice of the suit is sufficient to render the judgment valid against an absentee, not even named in the suit. This is clearly not the law.

"The mere fact that the defendant had actual knowledge of the action is not sufficient to make the judgment valid * * *." Restatement, Judgments, § 6 Comment (d) at 38.

*See also* Clapper v. Chandler, Mo.App., 406 S.W.2d 114, 120 (1966).

Assuming that the plaintiffs are arguing that the publication in the newspaper was sufficient constructive notice to bind the Emory trustees by that judgment (in which they were not even named as parties), that argument must fall on due process grounds. It cannot be said that service by publication on a resident of the state, whose address is known is:

* * * reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)

Nor is service by publication upon a resident of the state, whose address is known, and who is not avoiding service, valid under Georgia law. Nor is any service by publication valid in Georgia absent a court order. Such service must also *name* the parties to be served. Georgia Code § 81A–104(d) (6), (e) (1) (i), (ii), (iii), (i).

■ It seems incredible that the plaintiffs would even suggest that one not named as a party to a suit nor served with process can be bound by a judgment rendered in that suit if the party had actual notice of its pendency. It is more likely that plaintiffs are arguing that the trustees should have intervened in the suit, assuming that they learned of its pendency. If this is their contention, it is manifestly incorrect and based on a misunderstanding of the concept of intervention as a matter of right. They seem to be under the impression that, if it is mandatory *for a court* to permit an interested party, in the prescribed circumstances, to intervene in a suit, it is also mandatory for that *party* to intervene, lest he be foreclosed from asserting his interests. If it was mandatory that the Emory trustees be made parties, it was incumbent on Mr. and Mrs. Dobbs, Jr. to make them parties. The

plaintiffs seek, by spurious argument, to shift to the intervenors in the instant case the obligation to intervene in the Georgia proceeding.

Our consideration thus far has concerned only the Emory trustees, who are not bound by the judgment of the Georgia court as a matter of Georgia law as well as due process under the Fourteenth and Fifth Amendments. This holding alone disposes of the plaintiffs' motion for summary judgment based on the full faith and credit clause, without deciding whether the defendant Trust Co. is bound by that judgment. However, if the Trust Co. was a necessary party to that Georgia proceeding, plaintiffs' motion would also fail on the ground that the judgment was void under Georgia law and is not entitled to full faith and credit in any other state. *See* Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

 Plaintiffs cite the general rule that if the settlor and all the beneficiaries consent to the termination of a trust, that trust may be terminated. This is undeniably the law. Restatement of Law, Second, Trusts, § 338; Scott on Trusts, Third Edition at 2688; 89 C.J.S. Trusts § 95, at 934 (1955); 54 Am.Jur. Trusts § 74. Our question is not whether the settlor and the beneficiaries had the power to terminate the trust, but who should have been made parties. Such a determination is of particular importance to the Trust Co. which, now aware of the disputed claims to the trust corpus, stands in a position of incurring double liability unless all parties interested in that trust corpus are bound by the Georgia court's decision purporting to terminate that trust and to direct distribution of the corpus. The law of Georgia is clear that a trustee is a necessary party to a proceeding seeking to terminate a trust, and that a judgment rendered without a necessary party is void. New York appears to follow the same rule, *i. e.*, the trustee is a necessary party. Thus, no conflict of laws question is presented.

Under Georgia law,

"Trusts of every kind, not generally cognizable at law, are peculiarly subjects of equity jurisdiction." Ga.Code § 108–117

"Generally all persons interested in the litigation should be parties to proceedings for equitable relief * * *." Ga.Code § 37–1004

"In all cases of applications for the removal of trustees, or the sale of trust property, or the investment of trust funds, or *similar cases where any person is interested besides the applicant*, notice to such persons must be shown, or his absence accounted for, before the court shall proceed in the cause (emphasis added)." Ga.Code § 37–1303

The classic Georgia case interpreting § 37–1004 of the Georgia Code is Mason v. Young, 203 Ga. 121, 45 S.E.2d 643 (1947). In *Mason*, the plaintiff in suit 1 was in possession of certain premises in fee simple under a deed from the grantor. The plaintiff sued to clear title to the property because of a subsequent trust deed from the same grantor conveying the property to the plaintiff for life and to his oldest son at his death. Since the grantor, who was also the trustee of the subsequent trust deed, was dead, the plaintiff made his son (the remainderman) the defendant and his interests were represented by a court-appointed guardian. The trust deed was canceled. In suit 2, the son, as plaintiff, challenged the validity of suit 1 on the ground that no trustee had been named in that suit. After citing § 37–1004, the court held that:

In creating a trust estate legal title to the property conveyed vests in the trustee, and the equitable title in the cestui que trust for whom the trust was created * * *. Accordingly, in an action to cancel a trust deed it would seem that the trustee, if in office and in life, would be a necessary party defendant to such a suit.

It is true, as plaintiffs point out, that the court in *Mason* held that the trustee was

not a necessary party to that suit. In *Mason*, however, the trustee was dead at the time the suit was brought. In the instant case, the trustee was "in office and in life," and the exception carved out in the *Mason* case is inapplicable. The holding in *Mason* appears to be the general rule regarding trustees as necessary parties. See 3a Moore's Federal Practice, ¶ 19.12.

Later decisions of the Supreme Court of Georgia reaffirm the general rule that, in an action to cancel an instrument, the grantor and grantee are necessary parties. Weatherly v. Citizens & Southern National Bank of Macon, 222 Ga. 312, 149 S.E.2d 688 (1966); Sowell v. Sowell, *supra*. The latter case is of particular note in that it cites the *Mason* case as an example of this general rule. While these two decisions do not speak to the precise issue of whether the trustee is an indispensable party to a suit to cancel a trust deed, it would appear that such a rule vis-a-vis the trustee is included within that general rule and gives the *Mason* case added validity. New York also appears to follow the general rule, *i. e.*, that trustees are necessary parties. *See* McKnight v. Bank of New York & Trust Co., 254 N.Y. 417, 173 N.E. 568 (1930).

■ Under Georgia and New York law, the trustee is a necessary party to a suit to cancel a trust instrument. The absence of a necessary party deprives the court of jurisdiction, *Sowell, supra*, 92 S.E.2d at 526, 10 Encyclopedia of Georgia Law, Equity, § 129 at 635; and a decision rendered in the absence of a necessary party is void. Since the Trust Co. was not made a party, the 1967 judgment of the Georgia court is void and is not binding on either the Emory trustees or the Trust Co. Furthermore, the judgment being void under Georgia law, is not entitled to full faith and credit in any other court in the country. *Hanson, supra*, 78 S.Ct. at 1240–1241.

What has already been decided makes it unnecessary for this court to consider whether the Georgia courts could have rendered a valid judgment as to the Trust Co., if the plaintiffs had served them and sought to make them parties to the 1967 proceeding. That issue, raised by the intervenor-defendants, is not properly before this court, since no such attempt was made. Suffice it to say, that an interesting question, quite similar to that raised in Hanson v. Denckla, *supra*, would have been raised had any service been attempted. The parties to the instant case fail to recognize that the key fact in *Hanson* was the failure of the trustees to appear although they had been served. It is quite possible that the Trust Co., if served, would have appeared voluntarily in the Georgia proceeding, if for no other reason than to settle once and for all competing claims to Coca-Cola stock in its possession, regardless of whether the Georgia court had acquired jurisdiction over it.

■ It is also unnecessary for this court to consider the effect, if any, on the proceedings in question, if the Georgia court had had *in rem* jurisdiction over the trust assets. Since the trust assets have been held in New York from 1930 to date and the trust itself was executed in New York, it is most unlikely that Georgia had sufficient contact with the res to secure *in rem* jurisdiction over it. *Hanson, supra*, 78 S.Ct. at 1236–1238. In any event, assuming *in rem* jurisdiction in Georgia, the parties who claimed an interest in the res would still have had to be served in some manner in order to validly adjudicate their interest therein. The notice in the Fulton Daily Record would not be adequate. (Supra at 17–18).

### The Cross-Motion for Summary Judgment

There is no genuine issue of fact and the evidence in support of the cross-motion is overwhelming. It consists of the following:

1. The sworn affidavit of M. E. Kilpatrick, one of the Emory trustees, to the effect that he personally approached Dobbs, Sr., and asked him to loan the stock in question to his son to secure

the son's obligation under the separation agreement.[3]

2. The records of Lichens during the years 1936–1951 (from the time Dobbs, Jr. represented that he owned the stock to the liquidation of Lichens) reflect the ownership of the stock in question by Lichens.

3. Federal income tax returns of Lichens for the years 1947–1950 report the Coca-Cola dividends as corporate income.

4. Dobbs, Jr. was a director of Lichens during the years 1936–1951 and, as such, had access to the books and records of that company which showed the Coca-Cola stock to be an asset of Lichens. Dobbs, Jr. never claimed ownership thereof, although he now claims to have owned the stock since 1936. During this same period, Dobbs, Jr. was a partner in Dobbs & Company, in whose street name the stock was registered. The records of Dobbs & Company showed ownership of the stock in Lichens. Dobbs, Jr. never claimed ownership thereof, although he now claims to have been the owner since 1936.

5. On June 27, 1951 (after the settlement of the caveat to his father's will, and also after releases in connection therewith were signed) (see *infra*), Dobbs, Jr. acknowledged in writing to Mr. R. J. Sauls, the auditor of Lichens' records for the Emory trustees, that the stock was owned by Lichens, subject to the terms of the Brooklyn Trust. See note 1 *supra*.

6. In April, 1952, *after months of negotiations* between Dobbs, Jr., and his attorney, the attorneys for the Trust Co. and the attorneys for the Emory trustees, Dobbs, Jr., by letter dated April 24, 1952 and sworn to before a notary

3. Nearly five months after oral argument on the instant motions and while this opinion was being typed, plaintiffs moved to strike from the record the affidavit of M. E. Kilpatrick on the ground that it constituted a "clear violation of the Canons of Professional Ethics of the American Bar Association * * *." Plaintiffs do not ask that Kilpatrick be disqualified from representing the intervenor-defendants but only that his affidavit be stricken. The court notes that the motion was filed almost six months after the Kilpatrick affidavit became part of the record in this case.

Basically, the plaintiffs object to that part of the Kilpatrick affidavit which states that he had participated in negotiations with Dobbs, Sr. which culminated in the latter lending the stock now in dispute to his son for purposes of the 1936 trust agreement. They argue that Kilpatrick, as a member of the firm which represented Dobbs, Jr. in 1936, should be barred from testifying against the interests of a former client in the present suit.

If this proposition were true, Kilpatrick, as the trustee of the Emory Trust, would be placed in the uncompromising dilemma of supporting his former client to the detriment of his present client. However, the issue of whether the cases cited by plaintiffs support their position regarding the present incompetency of Kilpatrick to testify against Dobbs, Jr., is a question that the court need not presently pass upon. This is so because, even if the court were to discount Kilpatrick's affidavit regarding the ownership of the stock in 1936, Dobbs, Jr. has, himself, on two separate occasions, sworn to the fact that he is not the owner of the stock. In fact, on April 24, 1952, he swore to the fact that the stock had been loaned to him by the Lichens 'Co. Since his father owned 90% of the Lichens stock at the time, it is an obvious inference (without Kilpatrick's corroboration of the fact) that his father had arranged that loan.

In any event, as the plaintiffs' brief on the instant motion points out, " * * * all they are asking is that the intervenors be held to competent evidence." The court finds that the admittedly "competent evidence" in the record clearly supports the defendants' theory that Dobbs, Jr. did not own the stock in 1936, and that the stock was loaned to Dobbs, Jr. in that year. Therefore, it is unnecessary for the court to decide whether Kilpatrick's affidavit should be stricken, and whether he has violated the Canons of Ethics because the court would reach the same conclusion, even if the affidavit were stricken. The plaintiffs' belated motion appears to be still another futile attempt to avoid the inevitable decision on the merits of this case.

(his attorney, Harter Wright, Esq.) re-affirmed that the said letter of June 27, 1951 was correct and requested the Trust Co. to turn the stock over to the Emory trustees upon the termination of the Brooklyn Trust. In light of the protracted negotiations, it is inconceivable, as Dobbs, Jr. now contends, that that letter (or the letter of June 27, 1951) was signed and sworn to inadvertently.

7. After the liquidation of Lichens in February 1951, the Emory trustees received all the dividends on the Coca-Cola stock from Dobbs & Company until Dobbs & Company's liquidation in 1957. Thereafter, the Emory trustees received the dividends until 1963 from R. Glynn Mays, the Liquidator of Dobbs & Company. Since that time, the Trust Co. has received the dividends on these shares, with the exception of the dividends on 1,114 shares which dividends were paid to the Emory trustees by the Liquidator of Dobbs & Company.

8. During 1951–1963, in the audited financial statements of the Emory Trust, the stock has been reflected as a capital asset of said trust, and the dividends thereon as trust income.

9. The United States Estate Tax Return of the Estate of Dobbs, Sr. does *not* list the Coca-Cola stock as a gift *inter vivos* by the testator, although it lists other gifts as far back as the 1920s.

10. Over the years, approximately $170,000 in cash dividends on the Coca-Cola stock has been paid to Lichens and the Emory trustees, without one penny ever going to Dobbs, Jr. It is incredible that one who owned (or claimed to own) this property would sit by idly for nearly thirty-five years while $170,000 of his money was given away to others and especially during the period of fifteen years, beginning in 1952, during which his defaults under the separation agreement exceeded $120,000.

Dobbs, Jr. received $782,000 in *inter vivos* gifts from his father. He received an additional $500,000 in the settlement of the caveat to his father's will and defaulted in his alimony payments in the sum of over $120,000 over a fifteen year period, beginning in 1952. This amount, of course, had to be made up by the sale of stock by the Trust Co. and, due to the increase in value of the stock, caused a diminution of the trust corpus of over $280,000. Now he seeks to claim ownership of the stock itself.

Despite the overwhelming proof in support of the cross-motion, it is passing strange (or is it?) that neither Dobbs, Jr., nor his attorneys, nor the attorneys for the Administratrix of the estate of Mrs. Dobbs, Jr. has submitted any proof (not even an affidavit) to contradict those of the intervenors, or to support the representation which Dobbs, Jr. made in the 1936 separation agreement that he was the owner of the Coca-Cola stock.

Upon the argument of this cross-motion, the court alluded on several occasions to the fact that the plaintiffs had submitted no papers in opposition to the cross-motion. They replied that they would submit no such papers and would rely upon their contention that the moving papers themselves reveal that there are issues of fact which must be determined at trial. They made no specific reference to any such claimed issue of fact. They did, however, claim that the releases, executed when Dobbs, Jr.'s contest in the proceeding for the probate of his father's will was compromised, are dispositive. How or why it was so dispositive was not stated. The only reasonable inference which the court can draw from these vague oral arguments is that the plaintiffs are saying that, regardless of the true ownership of the stock, the Emory trustees are estopped from claiming and proving ownership thereof and that, as a result, the court must accept proof of ownership of the stock by Dobbs, Jr. because he represented in the trust agreement of 1936 that he was the owner and that the court may not consider his subsequent sworn admission to the contrary because of the release signed on February 26, 1951.

### The Release

 Plaintiffs argue that the Emory trustees are foreclosed from now asserting their rights to the Coca-Cola stock as a result of a release that was signed on February 26, 1951. To understand plaintiffs' claim, it is necessary to set forth the circumstances under which that release was executed.

Dobbs, Sr. died in October of 1950. Sometime thereafter, Dobbs, Jr. filed a caveat to his father's will. The dispute was ultimately settled among the following parties: The executors of the will of Dobbs, Sr. (The First National Bank of Atlanta and M. E. Kilpatrick); the trustees of the Emory University or "Lichens Trust" (M. E. Kilpatrick and C. H. Candler); the trustee of a subsequent and unrelated trust, the "Coca-Cola Trust" (M. E. Kilpatrick); the partners of Dobbs & Co. (Dobbs, Jr., A. Greiner and Jeff Armbrister). A memorandum of the agreement between all these parties was signed the very day that the release in question was executed. The stated purposes of the settlement agreement, in addition to settling certain claims against the "Coca-Cola Trust," (not here relevant) were:

(1) settlement of the issues raised by caveat of S. C. Dobbs, Jr., to the probate of the last will and testament of S. C. Dobbs * * * and settlement of all claims of every nature of said S. C. Dobbs, Jr., against the Estate or either of the Trusts * * *.

This agreement provided, *inter alia*, for:

1. the payment of over $500,000 to Dobbs, Jr.;

2. the resignation of Dobbs, Jr. as a trustee of the Lichens Trust (Emory Trust);

3. the appointment of C. H. Candler as successor trustee of the Lichens Trust;

4. the resignation of Dobbs, Jr. as an officer and director of the Lichens Company;

5. withdrawal by Dobbs, Jr. of his objections to the probate of his father's will;

6. a release by Dobbs, Jr. of any and all claims against his father's estate, except as to devises or bequests to him under his father's will;

7. relinquishment by Dobbs, Jr. of any and all claims against the Lichens Trust and the Coca-Cola Trust;

8. relinquishment by the Executors of the Estate of Dobbs, Sr. and the trustees of the Lichens Trust and of the Coca-Cola Trust of any and all claims against Dobbs, Jr.

This agreement did not mention the Coca-Cola stock specifically, but did itemize what Dobbs, Jr. was to receive from his father's estate pursuant thereto and contained a recital that, but for the agreement, what Dobbs, Jr. was to receive pursuant thereto would have passed under his father's will to the trustees of the Lichens Trust and the Coca-Cola Trust for the benefit of Emory University.

The release which Dobbs, Jr. executed simultaneously with the settlement agreement provided, *inter alia*, as follows:

In resigning as Trustee, I hereby acknowledge that I have no claims of any nature against the trust estate either as Trustee of the said trust, as a beneficiary of the said trust, as an heir or next of kin of Samuel C. Dobbs, Sr., as a beneficiary under the will of Samuel C. Dobbs, Sr., or arising in any manner whatsoever, I hereby release, relinquish, and disavow any claim of any nature whatsoever arising in any manner whatsoever that I may have against the said trust estate or against M. E. Kilpatrick and C. H. Candler, Sr. as Trustees of the trust estate. I do further disavow, relinquish and release any claims of any nature arising in any manner that I may have against any other trust estate or the Trustees thereof that may have been established by Samuel Candler Dobbs, Sr. either in his life or under his will.

This resignation and release is subject, however, to the condition that it be accepted by [the trustees] and that said acceptance shall constitute a release by said trust estate and by [the trustees] *of any claims of any nature they may have as Trustees against me for any acts or omissions by me heretofore in my capacity as Trustee, or otherwise* (emphasis added).

When the settlement agreement and release were executed on February 26, 1951, there was no dispute as to the ownership of the Coca-Cola stock. The acts of Dobbs, Jr. individually (as well as his failure to act); the acts of Lichens; the acts of the executors under the last will and testament of Dobbs, Sr. and of the trustees of the Emory (Lichens) Trust—including Dobbs, Jr.—are consistent only with a common understanding that the Coca-Cola stock was never owned by Dobbs, Jr. but, rather in chronologic order, by Lichens and the trustees of the Emory (Lichens) Trust, subject only to the terms of the Brooklyn Trust to guarantee performance by Dobbs, Jr. of his obligations under the 1936 separation agreement.

Dobbs, Jr. made this crystal clear and also affirmed that the settlement agreement and release did not relate to the Coca-Cola stock on two occasions subsequent to February 26, 1951, to wit, by his letter of June 27, 1951 and his letter of April 24, 1952.

Despite the overwhelming evidence, only the attorneys for the plaintiffs (not Dobbs, Jr., who stands mute and has not had the temerity to swear under oath to an affidavit to be submitted to this court) have argued, orally, that two words in the release ("or otherwise"), taken out of context and without reference to the settlement agreement simultaneously executed, suffice to present a genuine issue of fact as to the intention of the parties to the said agreement and the said release. They appear to prefer to ignore the intention of Dobbs, Jr., so clearly declared in his letters of June 27, 1951 and April 24, 1952. Fur-

thermore, it is incredible that the executors of the estate of Dobbs, Sr. and the trustees of the Emory (Lichens) Trust would have intended to release their claim to the Coca-Cola stock, such a valuable asset, without specifically mentioning this stock in the settlement agreement, which was so specific as to the property Dobbs, Jr. was to receive pursuant thereto. It is equally incredible that Dobbs, Jr. has sat idly by since February 26, 1951, while dividends on the Coca-Cola stock (which his attorneys claim he owned since 1936 and still owns) were paid to the trustees of the Emory Trust. The inaction of Dobbs, Jr. and his written disclaimers of ownership of the Coca-Cola stock since February 26, 1951 tell the court more about the meaning of the release than do the feeble and futile arguments of his attorneys.

The cross-motion of the intervenor-defendants for summary judgment is granted with costs and disbursements.