Frances MORRIS and Maxine
Woods, Plaintiffs,

v.

L. Marion GRESSETTE, President Pro
Tem of the South Carolina Senate, et
al., Defendants.

No. CA/75–1998.

United States District Court,
D. South Carolina,
Charleston Division.

March 12, 1976.

**332**

Armand G. Derfner, Charleston, S.C., Paul R. Dimond, Lawyers Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Kenneth L. Childs, Treva G. Ashworth, Asst. Atty. Gen., Randall T. Bell, Columbia, S.C., for defendants.

Before HAYNSWORTH, Chief Circuit Judge, RUSSELL, Circuit · Judge, and HEMPHILL, District Judge.

DONALD RUSSELL, Circuit Judge:

The plaintiffs seek by this action to enjoin the enforcement of the South Carolina State Senate Reapportionment Act of 1972 (described as Act 1205 in the complaint) [1] on the ground that such Act has never been validated as required by § 5 of the Voting Rights Act of 1965, § 1973c, 42 U.S.C.[2] The background of the legislation under review and the litigation surrounding it is fully set forth in *Harper v. Levi* (1975) 171 U.S.App. D.C. 321, 520 F.2d 53. It is unnecessary to repeat it in any detail since the issues involved here are fairly narrow and the factual basis for them largely uncontroverted.

It is conceded by all parties that the challenged legislation is within the coverage of the Voting Rights Act of 1965 and that compliance with § 5 of that Act was a condition to the enforcement of such legislation. Compliance, giving the State either interim or permanent clearance for enforcement of the legislation, however, could have been effected by the State under § 5 in two ways. It could have filed an action for a declaratory judgment in the District Court for the District of Columbia or it could, through the State Attorney General, have submitted the legislation to the Attorney General of the United States for such clearance. If, in the declaratory judgment action, the legislation had been found not to offend the Voting Rights Act, or, if the Attorney General of the United States,

---

1. Senate Reapportionment Statute, Act 1205 of 1972.

2. Plaintiffs rely for authority to maintain the action, it would seem, on *Allen v. State Board of Elections* (1969) 393 U.S. 544, 561, 89 S.Ct. 817, 829, 22 L.Ed.2d 1:

"* * * [A]n individual may bring a suit for declaratory judgment and injunctive relief, claiming that a state requirement is covered by § 5, but has not been subjected to the required federal scrutiny."

within sixty days after submission to him, failed to interpose an objection to the legislation, the State could enforce the revised election procedure, unless and until there has been a successful proceeding to invalidate the state law on constitutional grounds.

In this case, the State chose, in line with the practice generally adopted by complying States under the Act, to follow the procedure of submitting the reapportionment legislation to the Attorney General of the United States.[3] It is conceded the Attorney General did not interpose an objection to the legislation within sixty days after it was properly submitted to him. Actually, he advised the State formally within the sixty day period that he interposed no objection to the enforcement of the legislation. The plaintiffs herein, however, filed, about thirty days after the expiration of the sixty day period allowed the Attorney General to interpose objection, "a class action in the District Court [of the District of Columbia] seeking review, pursuant to Section 10 of the Administrative Procedure Act, or [the] decision of the then Attorney General to forego objection under Section 5 of [the] proposed reapportionment of the South Carolina Senate."[4] The District Court held in that case that the action of the Attorney General was reviewable under the Administrative Procedure Act[5] and, on review, concluded "that the Attorney General had not fulfilled his statutory obligation and ordered him to reconsider without regard to the prior court decision."[6] On appeal, the jurisdiction to review was upheld and the finding that the

prior failure to interpose an objection by the Attorney General was ineffectual to make the enforcement of the Act effective was sustained.[7]

At this point, the plaintiffs, armed with the decision in *Harper* returned to this Court. They contended that, on principles of collateral estoppel, *Harper* is conclusive on the issues of (1) the reviewability under the Administrative Procedure Act of the Attorney General's initial decision not to interpose an objection, (2) the invalidity of that initial action of the Attorney General, and (3) the effectiveness of the objection to the legislation, entered by the Attorney General, in obedience to the decision of the District Court in that case some year and a half after the submission to the Attorney General under the Act, as an absolute bar to enforceability of the state legislation, absent successful prosecution of a suit for a declaratory judgment of the constitutional validity of such legislation. Under this argument, if sustained, we would be limited in the action we could take to enjoining the enforcement of the Act itself for failure to comply with the requirements of § 5 and to ordering the State to submit in a reasonable time an acceptable substitute reapportionment plan or, in default of such submission, to promulgating an interim plan of reapportionment of our own. The defendants assert, on the other hand, that collateral estoppel is not applicable and that this Court is free to exercise its own independent judgment on the question whether the failure of the Attorney General to interpose within sixty days an objection automatically authorized the State to enforce the Act.

3. *See,* Note, *Discriminatory Purpose, Charges and Dilution: Recent Judicial Interpretations of § 5 of the Voting Rights Act,* 51 *Notre Dame Lawyer* 333 at 334, n. 11.

4. It is of interest that the same judge who decided *Harper* later in another case where a private party sought judicial review of the Attorney General's determination under § 5 dismissed, *sua sponte* the petition for review, stating that "a request for review of the Attorney General's findings may be made *only* by the State or political subdivision covered by the Act." (Italics Court's) *Griffith v. United States* (May 3, 1974) Cir. # 74-648, D.C. of District of

Columbia. This same conclusion was approved in *United Jewish Org. of Williamsburgh v. Wilson* (2d Cir. 1975) 510 F.2d 512, 520, n. 15. Under this construction of the statute the action in *Harper* should have been dismissed at the outset.

5. § 701, *et seq.,* 5 U.S.C.

6. *See, Harper v. Levi* (1975) 171 U.S.App.D.C. 321, 520 F.2d 53, 54–5.

7. 520 F.2d at 58.

It is obvious from this statement of positions that the first problem to be addressed is whether the defendants are precluded by collateral estoppel from asserting, contrary to the conclusions reached in *Harper v. Levi,* that the conditions of § 5 were satisfied when the Attorney General failed to interpose an objection within sixty days after submission to him of the Act. We conclude they are not so precluded. Our reasons for this conclusion follow.

■ There is no dispute with the proposition that, contrary to the earlier view based on a mechanical application of the principle of mutuality, the modern rule is that a valid judgment in a prior suit, involving the same issues may, by way of collateral estoppel be asserted in a subsequent action by a stranger to the first suit against one who was a party or, in privity with a party, in that earlier action. And this is the rule of our Circuit, as stated in a number of decisions. *State of North Carolina v. Chas. Pfizer & Co., Inc.* (4th Cir. 1976) 537 F.2d 67; *Thomas v. Consolidation Coal Company* (4th Cir. 1967) 380 F.2d 69, *cert. denied* 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599 (1967) *reh. denied* 389 U.S. 1059, 88 S.Ct. 768, 19 L.Ed.2d 862 (1968); *Graves v. Associated Transport, Inc.* (4th Cir. 1965) 344 F.2d 894; and *see,* generally, 31 A.L.R.3d 1044, *et seq.*[8] But this plea, it must be observed, is *only available against persons who were either parties to the prior judgment or, in privity with such parties.*[9] The Supreme Court so declared recently in *Blonder-Tongue v. University Foundation, supra,* 402 U.S. at 329, 91 S.Ct. at 1443:

"Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position. See *Hansberry v. Lee,* 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940); *Bernhard [Bernhard v. Bank of America]* 19 Cal.2d 807 at 811, 122 P.2d 892 at 894."

■ The courts have, it is true, developed some exceptions to this rule by broadening the definition of privies under the rule to include persons not expressly named as defendants but whose conduct and intimate participation in the action justify their being so classified. But, "in order for a person not formally made a party to a suit to be estopped by the decision therein, he must either be in privity with a party thereto in the strict sense of the term or he must not only aid in the prosecution or defense of a suit, but have the right to participate and control such prosecution or defense." *Hy-Lo Unit & Metal Products Co. v. Remote C.*

8. There is some conflict in the decisions whether this claim of collateral estoppel by a stranger to the proceedings may be asserted offensively, as do the plaintiffs in this case, or is limited to defensive application. The Supreme Court noted the distinction between an offensive and defensive use of the plea in *Blonder-Tongue v. University Foundation* (1971) 402 U.S. 313, 330, 91 S.Ct. 1434, 28 L.Ed.2d 788. It did not, however, decide whether the plea was limited in application to defensive assertion. Our Circuit similarly avoided resolving the issue for this Circuit in *North Carolina v. Chas. Pfizer & Co., supra.*

The leading case for use of collateral estoppel either offensively or defensively is *B. R. DeWitt, Inc. v. Hall* (1967) 19 N.Y.2d 141, 278 N.Y.S.2d 596, 225 N.E.2d 195, 31 A.L.R.3d 1035. The contrary view, limiting the plea to defensive use, is stated in Note, *The Impacts of Defensive and Offensive Assertion of Collateral Estoppel by a Nonparty,* 35 Geo. Washington L.Rev. 1010 (1967), in which the author states that "the judicial policies underlying collateral estoppel are generally subserved by allowing defensive assertion of the plea by a nonparty and frustrated by allowing offensive assertion, even though allowing the plea has the obvious effect of shortening the subsequent litigation in either case." A full list of relevant law review articles on the issue is set forth in 31 A.L.R.3d at 1050 and 1051.

9. *City of Richmond v. United States* (1975) 422 U.S. 358, p. 373, n. 6, 95 S.Ct. 2296, 45 L.Ed.2d 245; *Gratiot State Bank v. Johnson* (1919) 249 U.S. 246, 248–9, 39 S.Ct. 263, 63 L.Ed. 587; *Thomas v. Consolidation Coal Co., supra,* at 85; *Humphreys v. Tann* (6th Cir. 1973) 487 F.2d 666, 670–1, *cert. denied* 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 307 (1974); *Scooper Dooper, Inc. v. Kraftco Corp.* (3d Cir. 1974) 494 F.2d 840, 844; *Bruszewski v. United States* (3d Cir. 1950) 181 F.2d 419, 422, *cert. denied* 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950).

*Mfg. Co.* (9th Cir. 1936) 83 F.2d 345, 350. And this is the rule as it has been applied consistently in this Circuit. Thus, in *E. I. Du Pont de Nemours & Co. v. Sylvania I. Corporation* (4th Cir. 1941) 122 F.2d 400, 405, it was held that "mere assistance in the defense of a case is insufficient to bind a person not joined as a party;" it is only "participation in the trial and control of the litigation," which will "bind the participant" who is not "a party to the record." The same rule was restated in the later case of *Thaxton v. Vaughan* (4th Cir. 1963) 321 F.2d 474, 479, wherein the Court stated that the "mere appearance as a witness, or the supplying of an attorney," [10] is insufficient to bind a non-party by the judgment; [11] and that it is only "where a nonparty, * * * effectively controls the action" that "he may be bound by the result." [12] Other courts used a somewhat different formula in phrasing the exception, declaring that where one though not a formal party to the litigation, "had the initiative in a recognizably substantial litigation," he may be bound under the doctrine of collateral estoppel by the judgment entered therein. *Poster Exchange, Inc. v. National Screen Serv. Corp.* (5th Cir. 1975) 517 F.2d 117, 123. And they have defined "initiative" in this sense as "choice of forum." [13] Assuredly, if the criteria as stated in these cases are applied here, the defendants cannot be considered as either parties or privy to parties to the judgment in *Harper v. Levi* or bound by the decision in that case. They did not choose the "forum;" they did not assist in the defense; they did not participate in the trial; they were not consulted by the defendants on defense strategy; they did not

appear as a witness or supply an attorney; and they unquestionably did not control the litigation in *Harper*. They were accordingly not within the exceptions to the rule as stated in *Blonder-Tongue.*

The plaintiffs argue, though, that the present defendants could have intervened in *Harper* and that because they failed to intervene, the defendants are bound by the decision in that case, even though not named as parties defendant and even though they were not participants in any way in that case. This, it must be said, is an unusual and novel twist to the doctrine of collateral estoppel. Its broad applications, if adopted, could create shocking situations and disturb long-established principles. Under this claimed extension of the doctrine of collateral estoppel, a person, who knows of a suit wherever filed, involving an issue affecting him, and, though it may be that he cannot be served with process in that suit and made amenable to the jurisdiction of the Court, he, if he fails to intervene, can be concluded by the judgment in that case. Such an argument, so contrary to fundamental concepts of due process, can be justified neither in reason nor on authority and, whenever asserted, it has been consistently repudiated both in authoritative federal and state decision. *Chase National Bank v. Norwalk* (1934) 291 U.S. 431, 444, 54 S.Ct. 475, 78 L.Ed. 894; *Gratiot State Bank v. Johnson, supra,* 249 U.S. at 249–50, 39 S.Ct. 263; *Western Union Tel. Co. v. Foster* (1918) 247 U.S. 105, 115, 38 S.Ct. 438, 62 L.Ed. 1006; *Brown v. Wright* (4th Cir. 1943) 137 F.2d 484, 487; *Gonzales v. Cassidy* (5th Cir. 1973) 474 F.2d 67, 76; *McGhee v. United States* (1971) 437

---

**10.** To the same effect: *Rumford Chem. Wks. v. Hygienic Chem. Co.* (1909) 215 U.S. 156, 160, 30 S.Ct. 45, 54 L.Ed. 137; *Council Brothers, Inc. v. Ray Burner Company* (5th Cir. 1973) 473 F.2d 400.

**11.** *See, also, Bryson v. Guarantee Reserve Life Insurance Company* (8th Cir. 1975) 520 F.2d 563, 567.

**12.** *See,* for instance, *Ritchie v. Landau* (2d Cir. 1973) 475 F.2d 151, 155, n. 2 ("[o]ne who, though not a party of record, controls in furtherance of his own self interest the conduct of

adjudicatory proceedings by or against another is bound by the result of the proceeding"); *Drier v. Tarpon Oil Company* (5th Cir. 1975) 522 F.2d 199, 200 ("[p]rivity can be found if one party 'controlled the earlier lawsuit and its interests were represented by' the party to the first suit.")

**13.** *See James Talcott, Inc. v. Allahabad Bank, Ltd.* (5th Cir. 1971) 444 F.2d 451, 461–2, *cert. denied* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); *Brightheart v. McKay* (1966) 136 U.S.App.D.C. 400, 420 F.2d 242, 245, n. 4.

F.2d 995, 1000, 194 Ct.Cl. 86; *Hatridge v. Aetna Casualty & Surety Company* (8th Cir. 1969) 415 F.2d 809, 812; *King v. Kings County Lafayette Trust Company* (E.D.N.Y.1970) 323 F.Supp. 640, 648; *Pollard v. Roberts* (E.D.Ark.1968) 283 F.Supp. 248, 254, aff'd 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968); *Stott v. United States* (S.D.N.Y.1958) 166 F.Supp. 851, 854; *United States v. Cohen* (S.D.Fla.1967) 271 F.Supp. 709, 720; *State v. Fidelity and Casualty Company of New York* (1966) 268 N.C. 234, 150 S.E.2d 396, 401; *O'Hara v. Pittston Co.* (1947) 186 Va. 325, 42 S.E.2d 269, 280, 174 A.L.R. 945; *Sweeting v. Campbell* (1954) 2 Ill.2d 491, 119 N.E.2d 237, 240; *Crockett v. Harrison* (1960) 26 Ill. App.2d 9, 167 N.E.2d 428, 431; *Bannard v. New York State Natural Gas Corporation* (1961) 404 Pa. 269, 172 A.2d 306, 312; *Mixon v. Barton Lumber and Brick Company* (1956), 226 Ark. 809, 295 S.W.2d 325, 329; 46 Am.Juris.2d 680 ("[t]he right to intervene in an action does not, in the absence of its exercise, subject one possessing it to the risk of being bound by the result of the litigation, under the doctrine of res judicata.")

The opinion of Justice Brandeis, speaking for an unanimous Court in *Chase National Bank*, it would seem, should long ago have laid this argument to rest. There, he said (291 U.S. at 441, 54 S.Ct. at 479):

" * * * The law does not impose upon any person absolutely entitled to a hearing the burden of voluntary intervention in a suit to which he is a stranger. Whether under the Ohio practice it would have been possible for the trustee to intervene, we have no occasion to determine. Unless duly summoned to appear in a legal proceeding, a person not a privy may rest assured that a judgment recovered therein will not affect his legal rights."

In *Gratiot State Bank*, the same Justice had expressed the rule thus (249 U.S. at 249, 39 S.Ct. at 264):

" * * * The Trustee contends, however, that since by §§ 18b and 59f of the Bankruptcy Act, any creditor is entitled to intervene in the bankruptcy proceedings, the Bank should be considered a party thereto. * * * But he is under no obligation to intervene, and the existence of the right is not equivalent to actual intervention. Unless he exercises the right to become a party, he remains a stranger to the litigation and, as such, unaffected by the decision of even essential subsidiary issues."

And this was stated as the rule in this Circuit in *Brown, supra*, at p. 487, where Judge Parker put it:

" * * * And the fact that he may have had the right to intervene in the state proceeding is immaterial, since he did not in fact intervene or in any way make himself a party thereto."

To paraphrase *King*,[14] it "seems incredible," that the plaintiffs would press the argument that failure to intervene provides a basis for collateral estoppel in the face of such an array of final federal and state authorities. They, however, posit that *Penn-Central Merger Cases* (1968) 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723, supports their contention. We do not so understand this decision.

■■ *Penn-Central* was an unusual case involving an attempted railroad consolidation under the terms of Section 407 of the Transportation Act of 1920, as amended, § 5(2)(b), 49 U.S.C., where various objections to the plan of consolidation were made in different jurisdictions. The New York Court, where most of the objections were centered, ruled on certain objections to the plan and the Supreme Court merely held that when it had affirmed "the decision of the New York court," that decision of the Supreme Court itself on those issues necessarily "preclude[d] further judicial review or adjudication of the issues upon which it [the Supreme Court] pass[ed]."[15] But this conclusion does not, we suggest, rest on

---

14. *King v. Kings County Lafayette Trust Co., supra*, 323 F.Supp. at 648.

15. 389 U.S. 505–6, 88 S.Ct. 612.

collateral estoppel; it is no more than a statement of the well-recognized relationship of the Supreme Court to the inferior federal courts and the effect of the former's decisions on those of the latter. The decision of the Supreme Court on the issues decided in *Penn-Central* unquestionably obligated all lower federal courts to follow that decision and "precluded" them from reaching a contrary conclusion or adjudication on the issues resolved therein by the Supreme Court. *See Hicks v. Miranda* (1975) 422 U.S. 332, 344–5, 95 S.Ct. 2281, 45 L.Ed.2d 223. In other words, the Supreme Court was simply stating the obvious fact that inferior courts may not reverse the Supreme Court or its rulings. That is the holding in that case, as we view it. So construed, it accords with established principles and provides no warrant for assuming that failure to intervene may be translated into a collateral estoppel against one not a party to the litigation. Of course, had *Harper v. Levi* been affirmed on appeal by the Supreme Court, we would, as an inferior federal court, be obligated to follow it, just as the Supreme Court in *Penn-Central* said that all lower federal courts, confronted with the same issues decided by the Supreme Court therein, were bound to follow *Penn-Central.* But *Harper v. Levi* was not appealed and the Supreme Court did not affirm it. We are accordingly not obliged to follow it but may exercise our own judgment.

■ We now pass to the substantive issue, which is determinative of the plaintiffs' claim in this action. That issue is the reviewability at the instance of the plaintiffs of the Attorney General's decision not to interpose an objection to the State Senate's reapportionment statute within sixty (60) days after its submission. The Court in *Harper v. Levi* held, and the plaintiffs contend, that such decision was reviewable at the instance of the plaintiffs under the Administrative Procedure Act. We do not.

§ 5 is silent on the reviewability of the action of the Attorney General as provided thereunder. In that event, one "affected adversely" by the action will be entitled to judicial review thereof under the Administrative Procedure Act, if such action is adjudicatory and the one affected thereby has no "other adequate remedy in a court" [16] unless there is "persuasive reason to believe that [non-reviewability] was the purpose of Congress." [17] In our view the action of the Attorney General under § 5, however, is (1) not adjudicatory, and (2) any party with standing, who was dissatisfied with his action, had an "adequate remedy in a court," and (3) there were not simply "persuasive" but compelling reasons to believe non-reviewability of that action was "the purpose of Congress."

That the action of the Attorney General is not adjudicatory follows from the fact that it is neither a final nor a definitive finding of any kind on the validity of the legislation submitted.[18] It decides nothing on the merits which can bind anyone.[19] The determination of the Attorney General under § 5 has "no [more] binding legal consequence" than did the administrative action in *Ewing v. Mytinger & Casselberry* (1950) 339 U.S. 594, 600, 70 S.Ct. 870, 94 L.Ed. 1088, *reh. denied* 340 U.S. 857, 71 S.Ct. 69, 95 L.Ed. 627 (1950), which, because it included "no binding legal consequence," and was not adjudicatory, was found not to be subject to judicial review.

**16.** 5 U.S.C. 704.

**17.** *Abbott Laboratories v. Gardner* (1967) 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 674.

**18.** *See, Columbia System v. U. S.* (1942) 316 U.S. 407, 424, 62 S.Ct. 1194, 1203, 86 L.Ed. 1563:

"We need not stop to discuss here the great variety of administrative rulings which,

unlike this one, are not reviewable—either because they do not adjudicate rights  *  *."

**19.** "The Attorney General [in making his determination] does not act as a court in approving or disapproving the state legislation." *Allen v. State Board of Elections, supra,* 393 U.S. at 549, 89 S.Ct. at 823.

Nor does the Attorney General's action operate to bar any party, whether it be the submitting State or political subdivision or a complaining private party, from maintaining in an appropriate proceeding its or his claim in reference to the validity of the submitted legislation. § 5 makes this especially clear with its proviso that "neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement * * *." The right of these plaintiffs to attack this State reapportionment act on constitutional grounds under the Fifteenth Amendment thus remained intact, unimpaired in the slightest by the Attorney General's determination, and expressly preserved by the specific language of § 5 itself. If the State which submits the legislation is dissatisfied with the Attorney General's determination, its "remedy in court," as declared in the section, is not judicial review of the Attorney General's determination but a declaratory judgment action in the District Court of the District of Columbia. In *Allen v. State Board of Elections, supra,* 393 U.S. at 549–50, 89 S.Ct. at 823, the Court made this abundantly clear:

> "If the Attorney General objects to the new enactment, the State may still enforce the legislation upon securing a declaratory judgment in the District Court for the District of Columbia.

>     \*    \*    \*    \*    \*    \*

> "Once the State has successfully complied with the § 5 approval requirements, private parties may enjoin the enforcement of the new enactment only in traditional suits attacking its constitutionality; there is no further remedy provided by § 5."

It cannot then be said that the plaintiffs, if denied the right of judicial review, are without an "adequate remedy in court" for the vindication of their rights under the

Fifteenth Amendment. This "other adequate remedy" is far more immediate and more available than that available to an employer in a certification proceeding under the National Labor Relations Act, which has been held not reviewable under the Administrative Procedure Act, *see N.L.R.B. v. Clement-Blythe Companies* (4th Cir. 1969) 415 F.2d 78, 81–2, and the procedure which the Court said in *South Carolina v. Katzenbach* (1966) 383 U.S. 301, at 333, 86 S.Ct. 803, at 821, 15 L.Ed.2d 769, might be "a partial substitute for direct judicial review."

▪ In *Klein v. Commissioner of Patents of United States* (4th Cir. 1973) 474 F.2d 821, 824, we declared that § 704, 5 U.S.C. of the Administrative Procedure Act, established "two essential elements as a prerequisite to judicial review: (1) final agency action and (2) no other adequate remedy in a court." It is plain the plaintiffs cannot satisfy either the requirement that the administrative decision be adjudicatory or the requirement that the plaintiffs be without "any other adequate remedy in a court." Neither of those requirements for judicial review applies to the Attorney General's determination under § 5.[20]

▪ There is another objection to judicial review of the Attorney General's determination at the instance of the plaintiffs. It is one that the District Court in *Harper* did not note and that the Court of Appeals on appeal glossed over without any real discussion. The right to judicial review under the Administrative Procedure Act is given only to one who is "adversely affected" or who has suffered "injury in fact" by the challenged administrative ruling. § 702, 5 U.S.C.; *Conservation Council of N. C. v. Costanzo* (4th Cir. 1974) 505 F.2d 498, 501; *Duba v. Schuetzle* (8th Cir. 1962) 303 F.2d 570, 574–5. However the Attorney General decides under § 5, that determination

**20.** *See Common Cause v. Mitchell* (C.A. No. 2348–71, D.D.C. March 30, 1972) where the Court dismissed an attempt to review the Attorney General's determination with this reasoning:

"\* \* \* 42 U.S.C. § 1973c does not require the Attorney General of the United States to make determinations that are subject to the adjudicative and judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.,* (1971)."

cannot, as we have seen, bar the rights of the plaintiffs to vindicate their rights in the courts. They are not "adversely affected" by the Attorney General's ruling. The only party which could be "adversely affected" by the Attorney General's determination, if adverse to the enforcement of the legislation, would be the State or political subdivision whose proposed change was denied clearance; and it would be only that State or political subdivision which would have standing to invoke judicial review, if such were available. And that is exactly what the same District Court which decided *Harper,* it would seem, held a year after it had decided *Harper.*[21] The plaintiffs would lack standing to request a review of the Attorney General's determination, if review were permissible.

The plaintiffs, however, cite the recent case of *Dunlop v. Bachowski* (1975) 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377, as supporting their contention that the action of the Attorney General under § 5 was reviewable at their instance. That case, far from supporting, actually illustrates, by contrast, the non-reviewability of the Attorney General's action under § 5. In *Bachowski,* the statute grants the Secretary of Labor authority to determine whether there were sufficient irregularities in a union election to justify a suit to invalidate that election and, if he does, he "shall" file suit for that purpose.[22] But the statute specifically provides that "[t]he remedy" thus provided "for challenging an [union] election already conducted shall be exclusive."[23] In short, the action of the Secretary is absolute and final, and unless his finding supports a suit and he decides to sue, any member, who may have filed the complaint prompting the

Secretary's investigation, is completely without any remedy in any court; he is absolutely at the mercy of the Secretary and his decision for the vindication of his rights with reference to the election.[24] Under those circumstances, the Court properly found a right of judicial review of the Secretary's decision. But here, the action of the Attorney General forecloses no one's rights to pursue his claim "in a court;" indeed, it cannot affect in the slightest that right. All parties have, after the Attorney General's action, the same judicial remedy they had before his action was taken and those rights cannot be barred or prejudiced by the action of the Attorney General. *Bachowski* involved a procedure entirely different from that created under § 5.

Beyond this, the express language of § 5, as well as its legislative history, provides, as we have said, not simply "persuasive" but compelling reason to believe Congress did not intend that this determination by the Attorney General should be subject to the delays that would follow from judicial review. The legislative history relating to the inclusion of this provision in § 5 demonstrates that Congress intended thereby, as the Supreme Court in *Allen* phrased it, to give "the covered State a rapid method of rendering a new state election law enforceable"[25] without any of the delays incident to resort to the courts in any forum. The legislative purpose, as set forth in the provision, was to avoid the very judicial hearing, with its attendant delay, for which the plaintiffs argue. The legislative hearings, during which the provision was developed, confirm this conclusion. References were repeatedly made during these early hearings to the delays that resort to the courts

---

**21.** *Griffith v. United States, supra.*

See, *also, United Jewish Org. of Williamsburgh v. Wilson, supra,* at 520, n. 15, approving the result in *Griffith*:
"Indeed, a lawsuit was instituted directly in the District of Columbia District Court by some individual assemblymen from Kings County when New York's Attorney General decided not to sue on behalf of the State to overturn the April 1, 1974, order. This suit was summarily dismissed for lack of standing. *Griffith v. United States,* Civil No. 74–

648 (D.D.C. May 3, 1974). This clearly seems proper under *Allen v. State Board of Elections,* 393 U.S. at 561, 89 S.Ct. 817."

**22.** 29 U.S.C. § 482.

**23.** 29 U.S.C. § 483.

**24.** Cf., *Schonfeld v. Wirtz* (S.D.N.Y.1966) 258 F.Supp. 705, 708.

**25.** 393 U.S. at 549, 89 S.Ct. at 823.

would entail in the enforcement of changes in a State's election procedures.[26] There was growing disquiet in the committee over the extraordinary power being accorded for intrusion by the federal government through a veto on state legislative power as the hearings proceeded. This criticism of § 5, as it appeared in the original version submitted to the Congress by the Department of Justice, apparently came to a head during an appearance of the Attorney General before the Senate Judiciary Committee. The Attorney General conceded that the delays incident to judicial clearances of state legislation on voter qualification and election standards would "take[s] a long time" and "[i]n the interval the purposes of the act are frustrated." He then suggested, as an answer to the objection and as an expeditious means of securing an administrative clearance that would obviate the delays of any judicial proceedings and would in a proper case give clearance for immediate enforcement of the State legislation, the addition to the section of a provision "giving the Attorney General discretion" to pass on such laws and to deny clearance "only to those laws which the Attorney General takes exception to within a given period of time."[27] This suggestion

by the then Attorney General, who was the sponsor and had original responsibility for the drafting of the Act, was the genesis of that provision of § 5 which gives to the Attorney General the power to clear for immediate enforcement State legislation submitted by a State covered by § 4 of the Act. If the legislative purpose of including this provision was, as it seems plain it was, to make available a remedy that would not be subject to court delay and yet not bar the rights of any party with standing to defend or attack the State law in a proper proceeding, that purpose would be defeated by holding that the Attorney General's action was subject to judicial review.[28]

■ Judicial review of the Attorney General's determination, if intended by Congress, would, too, require the Attorney General to state more "explicit the basis" and reasoning for that determination. This is true, because, as the Court emphasized in *Dunlop*,[29] such supporting findings and reasoning are essential to judicial review. In no other manner could the court determine whether the determination of the Attorney General was based on "substantial evidence" and lacking in arbitrariness. But § 5 imposes no duty on the Attorney Gener-

---

**26.** *See*, H.R.Rep. No. 439, 89th Cong., 1st Sess., 38 (1965), U.S.Code Cong. & Admin.News, p. 2437.

**27.** The statement of the Attorney General was:
"*  *  * The effort [underlying § 5] is to prevent this constant slowing down process which occurs when States enact new laws that may clearly be in violation of the 15th amendment, but you have to go through the process of getting judicial determinations of that. It takes a long time. In the interval the purposes of the act are frustrated.
"Now, there may be better ways of accomplishing this [than relying solely on the declaratory judgment procedure]. *  *  * There are *  *  *, a good many provisions of State law, that could be changed that would not in any way abridge or deny the [Fifteenth Amendment] right; *  *  * perhaps this could be improved by applying it [the declaratory judgment procedure] only to those laws which the Attorney General takes exception to within a given period of time. Perhaps that would remove some of the burden."
Senate Hearings at p. 237.

**28.** The delays that would follow, if judicial review of the Attorney General's determination were found to exist, are well illustrated by the record in *Harper,* which involved no real factual review but concerned only an issue of law. The action was begun in the District Court in August, 1972, but the District Court, though the parties submitted the case on an agreed statement of facts, did not decide it until the middle of May, 1973, almost ten months later. The appeal from that decision was not heard until September, 1974, and the opinion of the Court of Appeals was not filed until the end of July, 1975. In other words, the right of the State to enforce its legislation, if § 5 is to be construed as plaintiffs contend and as *Harper* held, would have been delayed from May 2, 1972 to end of July, 1975, a period of over three years. It was this very delay, so graphically demonstrated by the record in this case which Congress, by providing for Attorney General clearance, sought to avoid.

**29.** 421 U.S. p. 571, 95 S.Ct. 1851.

al to make such explicit findings and we read *Georgia v. United States* (1973) 411 U.S. 526, 536, 93 S.Ct. 1702, 36 L.Ed.2d 472, as holding that the statute imposes none. In fact, the statute does not require the Attorney General either to object or not to object; he can be silent and, at the completion of sixty days from date of submission, the State or political subdivision may proceed to enforce the legislation.[30] That result is entirely inconsistent with any notion that the Attorney General must give reasons for his determination. To repeat, reviewability would frustrate the plain Congressional purpose.[31]

There is another troublesome matter that arises if the plaintiffs' theory is upheld. It would seem axiomatic that, if the plaintiffs have the right to judicial review of the Attorney General's determination, the State must have a like right. Just one party to a controversy cannot be given a right to review; the right must be equally available to both parties. Yet, it has been consistently assumed in all the decisions involving § 5 that, in the event the Attorney General objects to a State law, the State's sole and exclusive remedy is a declaratory judgment action in a three-judge District Court of the District of Columbia. See *Allen*, 393 U.S. at 562, 89 S.Ct. 817; *Georgia v. United States*, 411 U.S. at 541, n. 13, 93 S.Ct. 1702; *United Jewish Org. of Williamsburgh v. Wilson* at 520. But under any theory of the reviewability of the Attorney General's determination, review would be before a single District Judge. This certainly would be the result if *Harper v. Levi* were followed, and would be contrary to the decision in *Allen*, which declares that the State's only remedy is before a three-judge court.

In sum, the determination made by the Attorney General under § 5 is not reviewable and, when he failed within sixty (60) days after submission to interpose an objection to the South Carolina Senate reapportionment as provided in Act 1205, the State

**30.** *See, State Board of Election Commissioners v. Evers* (1972) 405 U.S. 1001 at 1003–4, 92 S.Ct. 1281, 1282–3, 31 L.Ed.2d 470 (Blackmun, J., concurring):

"I am unable so to read § 5 of the Voting Rights Act of 1965, and I cannot subscribe to the District Court's reasoning. Section 5, it seems to me, plainly and clearly provides that if the proposal has been properly submitted to the Attorney General, as it was, 'and the Attorney General has not interposed an objection within sixty days after such submission,' as he did not, the proposed statutory changes 'may be enforced' without the court's proceeding in the District of Columbia and without resubmission to the Attorney General. Here the proposal was properly submitted to the Attorney General and he took no action by way of interposing an objection within the allowed 60 days. I do not see how the statute can be read or construed in any way other than to the effect that the conditions of its proviso were fulfilled and that the proposed new legislation was therefore enforceable, subject, of course, to the statute's recognized exception as to any contest on the merits."

**31.** It is interesting that the plaintiffs in the thoroughly briefed case of *United Jewish Org. of Williamsburgh v. Wilson, supra,* at 520, n. 16, did not argue the reviewability of the Attorney General's determination:

"Appellants do not urge that a Voting Rights Act determination of the Attorney General is reviewable under the Administrative Procedure Act, probably because they concede it to be 'committed to agency discretion by law.' 5 U.S.C. § 701(a)(2). Analogous determinations under § 407 of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6, have been held not subject to judicial review. *United States v. Greenwood Municipal Separate School Districts*, 406 F.2d 1086 (5th Cir. 1969)."

The Court might well have added a reference to the determination by the Attorney General authorized under § 2000a–5, 42 U.S.C., Civil Rights Act of 1964. That determination is very analogous to the determination by the Attorney General under § 5. Under § 2000a–5 the requirement that the Attorney General certify that he has reasonable cause to believe that the defendant has engaged in a pattern or practice of resistance to the full and equal enjoyment of any rights secured by that statute, preliminary to the institution of an action by the Attorney General under that Act, is even more final and definitive on the rights of the adverse party than the Attorney General's determination under § 5. That determination, however, has been uniformly held to be conclusive and not subject to judicial review, since the defendant has a right to defend in court the basic issue of the existence of a pattern of resistance on his part. *United States v. Gray* (D.R.I.1970) 315 F.Supp. 13, 24.

of South Carolina was automatically authorized to enforce it; subject to the right of any proper party or parties to assail the constitutional validity of that legislation in an appropriate action.

The plaintiffs are accordingly not entitled to an injunction against the enforcement of the legislation by the defendants at this time and the complaint is dismissed.

*AND IT IS SO ORDERED.*